UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                   Case No. 07-CR-165

WALTER R. HAMBERGER,

    Defendant.

**RECOMMENDATION THAT DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND EVIDENCE BE DENIED**

### I. PROCEDURAL BACKGROUND

On June 27, 2007, a grand jury sitting in the Eastern District of Wisconsin returned a one-count indictment against the defendant, Walter R. Hamberger ("Hamberger"), charging him with using a facility and means of interstate commerce to knowingly attempt to persuade, induce, entice, and coerce a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Hamberger was arraigned on June 28, 2008 and pled not guilty. Trial was originally scheduled for September 24, 2007 before the United States District Judge Lynn Adelman. Per the defendant's September 14, 2007 motion, the trial date was adjourned. A new trial date has not yet been scheduled.

In accordance with the scheduling order issued in this case, Hamberger filed a motion to suppress statement and evidence and requested an evidentiary hearing. An evidentiary hearing was held before this court on September 18, 2007 and continued on September 27, 2007. Milwaukee Police Detective Doreen Andrews, Milwaukee Police Detective Sean Lips, Fox Lake Police Detective Joseph Martin, Fox Lake Police Detective Matthew Malczewski, and Fox Lake Police Officer William Golden testified for the government. Dr. McCay Vernon testified on behalf of the defendant.

In accordance with the briefing schedule set forth by the court and extensions granted thereto, the defendant filed his post-evidentiary brief in support of his motion on November 19, 2007; the government filed its response on January 18, 2008; and the defendant filed his reply on January 28, 2008. Accordingly, the defendant's motion to suppress has been fully briefed and is ready for resolution.

## II.  FACTUAL BACKGROUND

The following is a summary of the testimony presented at the evidentiary hearing.

A.  *The Investigation*

In May 2007, Detective Doreen Andrews ("Andrews"), a fifteen year veteran of the Milwaukee Police Department was assigned to the High Technology Unit as part of the Internet Crimes Against Children Task Force. Working undercover, Detective Andrews, portraying herself as a fourteen-year-old girl named "Maria," began chatting online with a man known to her at that time as "Wally" but later revealed to be the defendant. Detective Andrews testified that in her undercover capacity she chatted online with the defendant approximately fifteen times between May 21, 2007 and June 13, 2007. Their communications were further facilitated by the defendant's use of a web camera, which allowed Detective Andrews to view the defendant at his computer while they conversed. The two also exchanged text messages on a few occasions. The conversations were social and sexual in nature.

During the course of their conversations via the Internet, Hamberger revealed to Detective Andrews that he is hearing impaired. He did so by telling Detective Andrews that he wore a hearing aide and lifting up his hair to show the hearing aide to her. When "Maria" and "Wally" began to discuss meeting face-to-face, Hamberger told Detective Andrews that he would communicate with her using a notepad.

2

B.   *The Arrest and Interrogation*

"Maria" and "Wally" agreed to meet each other in Kenosha, Wisconsin on June 13, 2007. On that date, when the defendant stepped off the dock at the Kenosha train station, he was placed into custody and was transferred to the Kenosha Police Department. Once Hamberger arrived at the police station, Detective Andrews observed as other officers directed Hamberger to turn over his personal belongings and to remove his belt. The officers did so by speaking and gesturing to Hamberger. Hamberger responded appropriately to their requests.

Detective Andrews testified that she consulted with Detective Lesley Meredith about obtaining a sign language interpreter to assist Hamberger during the interrogation. Andrews learned that a sign language interpreter would not be available until the next day. Detective Andrews and her partner, Detective Sean Lips ("Lips"), decided to attempt the interrogation without an interpreter, but instead, by using a computer to communicate with Hamberger. Detective Andrews testified that this made sense to the detectives because all of their previous communications with Hamberger, with the exception of a few text messages, had been facilitated by a computer, and Hamberger appeared to effectively communicate with them through that medium.

After being booked at the Kenosha Police Station, Hamberger was placed in a witness interview room for interrogation. The room contained a table, three chairs, and a computer. Both Detective Andrews and Detective Lips were present. The interrogation was audiotaped and videotaped. The videotape of the interrogation was played for the court during the evidentiary hearing.

Upon beginning to interview Hamberger, Detective Andrews introduced herself by speaking and asking Hamberger if he could hear her. It was Detective Andrews' understanding that Hamberger had some limited ability to hear in his right ear, the one closest to her. (Dr. Vernon

3

subsequently testified that, while Hamberger does have some hearing in that ear, it is not enough to hear the spoken word.) Hamberger, looking somewhat confused, motioned to Detective Andrews that he could not hear her and appeared to indicate that he wanted to write. At that point, Detective Andrews began typing all her communications with Hamberger on the computer and reading them out loud for the audio and video tapes, making sure that Hamberger could see the computer monitor. While Detective Andrews typed, Hamberger appeared to be following along and nodded as if he understood what she was typing.

After Detective Andrews introduced herself and Detective Lipps, she asked Hamberger if he could read and write in English. Hamberger, speaking, stated "Yes, I can read English." Detective Andrews then handed Hamberger a written copy of the *Miranda* warnings. She typed the warnings out on the computer and also read them out loud. The videotape shows that Hamberger appears to be following along on both the card handed to him by Detective Andrews and her typed words on the computer monitor. At the appropriate moment, Hamberger flipped the card over to read the warnings continued on the back of the card. After she had typed and read out loud the *Miranda* warnings to Hamberger, Detective Andrew asked him, by typing and speaking, whether he understood those warnings. Hamberger typed, "Yes, I understand."

Detective Andrews then typed and said out loud, "Realizing you have these rights, are you now willing to answer questions or make a statement?" After pausing for a moment, Hamberger responded, "I'll willing to answer question." Hamberger then answered, through use of the keyboard, numerous questions posed to him by Detective Andrews. Hamberger responded both verbally and through use of the computer. Detective Andrews and Detective Lips both testified, and the videotape corroborates their testimony, that Hamberger's answers and responses to their questions appeared

4

appropriate and Hamberger appeared to be understanding and following along throughout the interview.

Detective Andrews then asked, by keyboard, for Hamberger's permission to search his house, computer, and cell phone. Hamberger responded, by asking, "ok, what if I refused what do?" Detective Andrews typed in response, "That's up to you, I'm asking for your consent and cooperation." Hamberger typed in reply that the police could search his apartment, computer, and phone. Detective Andrews typed "does that mean you give consent." Hamberger in turn replied via keyboard, "I want to cooperation" and verbally stated "yes." Detective Andrews attempted to verify Hamberger's understanding by asking, via the computer, whether Hamberger understood that he could refuse but he was choosing to consent. Hamberger nodded affirmatively and typed, "I'm giving consent." Hamberger then read and signed a consent to search form.

C.  *Fox Lake Police Department*

Also testifying at the evidentiary hearing were three employees of the Fox Lake Illinois Police Department: Detective Joseph Martin ("Martin"), Detective Matthew Malczewski ("Malczewski"), and Officer William Golden ("Golden"). All three were familiar with Hamberger through Hamberger's numerous interactions with the Fox Lake Police Department.

Detective Martin testified that he had arrested Hamberger on October 16, 2002 for operating a vehicle while under the influence. He knew Hamberger as a "deaf mute," and Detective Martin had had approximately ten contacts with Hamberger in the past. On all of those occasions, Detective Martin communicated with Hamberger by using a pen and pad of paper that Hamberger always carries with him.

In connection with the October 16, 2002 arrest, Detective Martin had occasion to advise Hamberger of his *Miranda* rights. Detective Martin testified that he wrote out the *Miranda* rights

on the pad of paper, one right at a time. After each right, Detective Martin asked Hamberger, in writing, if he understood the right and Hamberger, on each occasion, wrote "yes." Detective Martin testified that Hamberger did not seem confused about his *Miranda* rights.

Detective Martin testified that he had also arrested Hamberger in September 2002 for disorderly conduct. At that time, Detective Martin used the same procedure to advise Hamberger of his *Miranda* rights as he subsequently used in October 2002. On neither occasion did Detective Martin have a sense that Hamberger did not understand him.

Detective Malczewski testified that he arrested Hamberger on October 13, 2002, in a separate incident, for driving under the influence. Detective Malczewski was familiar with Hamberger from five previous contacts. He had always known Hamberger to communicate with a pad of paper and pen, and during the October 13, 2002 arrest, that is how Malczewski communicated with him. He testified that, on occasion, Hamberger would attempt to communicate verbally, but Detective Malczewski struggled to understand Hamberger's oral communications and thus encouraged him to communicate by writing on paper.

When reading Hamberger his *Miranda* rights, Detective Malczewski testified that he provided Hamberger with a copy of the rights and then Detective Malzcewski read them out loud to Hamberger while Hamberger followed along. Detective Malczewski asked Hamberger whether he understood a right by writing on Hamberger's pad of paper and Hamberger would nod affirmatively that he understood. After Hamberger indicated that he understood a right, Detective Malczewski would initial it and move to the next one. Detective Malczewski testified that Hamberger did not ask him any questions about the *Miranda* rights, and he did not have Hamberger explain the *Miranda* rights back to him.

Officer William Golden testified that he had contact with Hamberger in 2001 when Hamberger came to the Fox Lake Police Department to lodge a domestic battery complaint. Officer Golden testified that he was previously familiar with Hamberger through traffic stops, bar complaints, and a trespass investigation. Officer Golden testified that it was his understanding that Hamberger could not hear but is able to communicate through a pad of paper and pen he always carries with him. Officer Golden testified that he always communicated with Hamberger verbally and through use of the pad of paper. Hamberger would nod his head and write answers on his notepad.

D.   *Dr. McCay Vernon*

Dr. McCay Vernon ("Vernon") was hired by the defense to assess Hamberger. Dr. Vernon received a B.A., master's degree, and doctorate in psychology from the University of Florida and a master's degree in teaching deaf children from Gallaudet University.

Dr. Vernon testified that he primarily does forensic, writing, and consultation work in cases involving deaf individuals. He started his career as a teacher of deaf and blind children. After teaching deaf and blind children for eight years, he worked at the University of Illinois as a research associate professor doing research on language and deafness. He then did research on psychosis and deafness at the Psychiatric and Psychosomatic Institute at Michael Reese Hospital in Chicago. Subsequently, he worked as a professor of psychology at Western Maryland College for twenty years where he taught classes in psychological testing, psychology of deafness, general psychology in exceptional children, and other courses.

Dr. Vernon testified that he is well published in issues related to deafness. He published eight books, of which seven involve deafness or deaf blindness. He edited the journal American Annals

of the Deaf. He has also written six articles on *Miranda* warnings and deaf individuals. He also produced a video for the Police Research Forum to educate them on *Miranda* and the deaf.

Dr. Vernon testified that he knows and uses American Sign Language ("ASL") and that it is a language that has no written form. ASL has syntax, grammar, and vocabulary that are different from English. ASL is considered a language separate from English and is not a derivative of English.

In preparation for this hearing, Dr. Vernon testified that he was provided with copies of the criminal complaint, indictment, interrogation video, and transcript of the Internet chat between "Maria" and "Wally."

With respect to Hamberger's daily communications, Dr. Vernon testified that Hamberger has some speech that would be partially understood by people who are accustomed to hearing deaf speech and to people who are accustomed to hearing Hamberger speak, like his mother. However, for everyday transactions, Hamberger is able to communicate using gestures and writing. He does not need an interpreter for everyday transactions.

Dr. Vernon administered a number of standardized test to ascertain Hamberger's English language abilities. The tests performed are widely used and well-accepted in the scientific community. Hamberger took a variety of tests to gauge his English vocabulary, English reading ability, and English reading comprehension. All of the tests placed him at approximately the third grade level. Based on Hamberger's test results, Dr. Vernon concluded that Hamberger's English proficiency is very limited. Dr. Vernon testified that studies from Lamar University in Beaumont, Texas, assessing the readability level of the *Miranda* warnings, found that the Texas version of the *Miranda* warnings to be at approximately an eighth grade reading level, and that Dr. Vernon was familiar with the Texas version. Dr. Vernon further testified that the Wisconsin version of the *Miranda* warnings that was read to Hamberger was the most complex version of the *Miranda*

8

warnings he has seen. He explained that the Wisconsin version was more complex because it has more difficult words and longer sentences.

Dr. Vernon also explained the connection between reading comprehension and understanding the *Miranda* warnings. He testified that sign interpretation could be used to explain *Miranda* to a college educated deaf person. However, if a deaf person cannot read at the level of the *Miranda* warnings, then expansion and explanation through an interpreter would be needed.

Dr. Vernon testified that in ascertaining whether a deaf person understands *Miranda*, one should not ask the deaf person, "do you understand?" He opined that it is common for deaf people to nod or agree with such a question so as not to be stigmatized as "deaf and dumb."

Dr. Vernon opined that the *Miranda* warnings were not effectively communicated to Hamberger based on Hamberger's reading level. Dr. Vernon testified that the fact that Hamberger was born deaf is significant because individuals who are deaf before the age of three have an extremely difficult time ever fully understanding the English language. The average educational attainment of the pre-lingually deaf is around fourth grade, despite I.Q. He explained that the ability to learn in the deaf population is the same as in the hearing population. However, the inability to hear language deprives the deaf individual of mountains of information.

### III. DISCUSSION

Hamberger argues that "the waiver of his rights under *Miranda* . . . was not knowingly, intelligently, and voluntarily made" when he was interrogated by Detectives Andrews and Lips on June 13, 2007. Accordingly, he moves the court for an order suppressing any statements that he made during the interrogation and evidence obtained from the resulting search. Because this court finds that Hamberger waived his *Miranda* rights "voluntarily, knowingly, and intelligently" it will recommend that Hamberger's motion be denied.

9

The Fifth Amendment dictates that no defendant "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. In order to secure this privilege against self-incrimination, the government is required to "demonstrate[] the use of procedural safeguards effective to secure the privilege." *Miranda v. Arizona*, 384 U.S. 436 (1966). Accordingly, prior to questioning, a defendant "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. A defendant is free to waive these rights, provided he does so "voluntarily, knowingly, and intelligently." *Id*. Hamberger does not challenge the voluntariness of his statement. (Reply Br. at 2.) Accordingly, this court's inquiry will focus on whether Hamberger's statements were made "knowingly and intelligently."

A defendant "knowingly and intelligently" waives his *Miranda* rights when the defendant is fully aware "of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveals . . . the requisite level of comprehension may a court properly conclude the *Miranda* warnings have been waived." *Id*. (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The government bears the burden of proving that a waiver is knowing and intelligent. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Hamberger argues that he could not have waived his *Miranda* rights knowingly and intelligently because the rights were explained to him through the English written language. As a pre-lingually deaf individual, Hamberger contends that his comprehension and understanding of the English language is extremely limited; so much so, that he could not have fully understood the nature of his rights and the consequences of abandoning them when the *Miranda* warnings were presented to him in such a manner. While the court acknowledges that there may be instances where a pre-

10

lingually deaf individual might not be able to waive his *Miranda* rights knowingly and intelligently when such rights are presented to him only in the written English language, this is not one of those instances. To the contrary, in this instance, the court finds that Hamberger did waive his rights knowingly and intelligently. The court bases this conclusion on Hamberger's interactions with detectives during the course of the interrogation, as well as on his prior familiarity with the *Miranda* rights.

The videotaped interrogation reveals that Hamberger was relatively calm and comfortable during the interrogation. Indeed, Hamberger regularly asserted his needs and concerns from the moment he stepped into the witness interview room until the moment the interrogation ended. At the commencement of the interrogation, Detective Andrews began to speak to Hamberger, obviously under the mistaken impression that the limited hearing in his right ear may have been sufficient to allow a verbal interrogation. Hamberger immediately indicated to Detective Andrews that he could not understand her and made a motion with his hand appearing to indicate that he wanted to write. In so gesturing, Hamberger, without prompting from the detectives, eliminated verbal communication as a means of undergoing the interrogation. When Detective Andrew gestured to the computer, Hamberger appeared to enthusiastically embrace this particular method of communication. Unlike when the detectives attempted to communicate with him verbally, Hamberger made no gesture which indicated that the computer was an unacceptable method of communication.

Throughout the interview, Hamberger made several other requests of the detectives indicating that he was not afraid to make his needs known. He informed the detectives when the batteries in his hearing aide began to get low and requested new ones, and he requested a bathroom break and snack. Such requests demonstrate that Hamberger felt comfortable enough to "speak up" when necessary to express his needs and wants. Yet, despite this obvious comfort level, Hamberger never

11

asked for sign language interpreter. Indeed, at no time did Hamberger suggest that he did not fully understand what was happening and the questions that were being asked of him.

Notably, when the detectives asked Hamberger if he would consent to a search of his home, computer, and cell phone, Hamberger asked the detectives about the consequences of refusing this request. That such a question was posed to the detectives demonstrates that Hamberger knew the police interrogation was a serious matter and that no request should be acquiesced to lightly. This question further demonstrates that Hamberger was fully engaged, listening to, and understanding what the detectives were saying during the interrogation. It also demonstrates that Hamberger felt comfortable asking questions when he deemed it necessary or appropriate to do so.

In reaching such a conclusion, the court does not mean to suggest that it disregards entirely Dr. Vernon's concerns that it is common for deaf people to nod or agree to open ended questions, like Detective Andrews' question "do you understand," so as to not be stigmatized as deaf or dumb. However, Hamberger's question to Detective Andrews about the consequences of his consenting to a search indicates that concern of such stigmatization was not, at that time, on Hamberger's mind. To the contrary, his question demonstrates that Hamberger realized the severity of the situation in which he found himself and wished to fully understand the consequences of refusing the detectives' request for a consent to search. Given the comfort with which Hamberger made other requests of the detectives, coupled with his clear desire to understand the proceedings at hand, the court must conclude that Hamberger would certainly have asked the detectives questions about the nature of his *Miranda* rights if he had any concerns about the meaning of the *Miranda* rights or the consequences of waiving them.

This court is further convinced that Hamberger knowingly and intelligently waived his *Miranda* rights based on his previous familiarity with such rights. On no less than three prior

occasions, Hamberger had been advised of his *Miranda* rights by Fox Lake, Illinois police officers. On October 13, 2002, Detective Malczewski handed Hamberger a written copy of Fox Lake Police Department's *Miranda* waiver form. Officer Malczewski read the warnings out loud while Hamberger read them on the waiver form. After reading each line, Officer Malczewski wrote on Hamberger's pad of paper "Do you understand?" and each time, Hamberger wrote "yes." After reading all of the warnings to Hamberger, Officer Malczewski asked Hamberger to sign a waiver form if he understood his rights. Hamberger signed the form. On October 16, 2002, Detective Martin wrote out the *Miranda* warnings for Hamberger on a pad of paper one at a time and asked him if he understood each line. After each line was written, and Detective Martin asked Hamberger in writing if he understood, Hamberger wrote "yes." (As previously noted, Detective Martin had also advised Hamberger of his *Miranda* rights in September 2002.) Both officers testified that they believed Hamberger to have fully understood the rights presented to him. In the end, having been advised of his *Miranda* rights on three prior occasions, such rights would not have been new to him when they were again presented to him by Detective Andrews.

Dr. Vernon noted that, in assessing Hamberger's vocabulary and reading abilities, he did not have Hamberger read a *Miranda* waiver. This is because Hamberger had met with attorneys at the Federal Defender's Office prior to meeting with Dr. Vernon and had discussed the *Miranda* waiver at that time with the aid of an interpreter. That having been said, the defendant's argument that his third grade reading comprehension ability left him unable to understand the *Miranda* warnings, which were assessed at a much higher reading level, would hold more water if Hamberger had not previously been exposed to the warnings on at least three prior occasions. Such prior exposure, and Hamberger's experience with the *Miranda* warnings, leads the court to conclude that he surely did

13

understand the "nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran*, 475 U.S. at 421.

In holding that Hamberger knowingly and intelligently waived his *Miranda* rights, I am not insensitive to the challenges Hamberger, and others like him, face as deaf individuals. Indeed, Dr. Vernon persuasively testified that use of an interpreter is the ideal way to communicate conceptually complex information to a pre-lingually deaf individual like Hamberger. Because English is not Hamberger's primary language, providing Hamberger with an interpreter would have been a more effective way to communicate his *Miranda* rights to him and would have made it easier for the court to assess whether such rights were waived voluntarily, knowingly, and intelligently. However, the Constitution does not require that advising a defendant of his *Miranda* rights be done in any particular preferred way. All that is required is that they be communicated in a way that allows the individual to voluntarily, knowingly, and intelligently waive those rights if the individual so chooses.

It has been said that "a picture is worth a thousand words." In this case, the video tape of Hamberger's interrogation by Detectives Andrews and Lips demonstrates (at least to the extent that one human being can climb into another's mind) that Hamberger did indeed understand what those detectives were saying to him. The tape also clearly demonstrates that Hamberger communicated to those detectives that he wished to waive his *Miranda* rights and answer their questions.

In conclusion, the court is persuaded that, in this particular case, the methods used by Detectives Andrews and Lips to advise Hamberger of his *Miranda* rights were sufficient to allow him to understand such rights and to voluntarily, knowingly and intentionally waive them, which Hamberger did.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress evidence (dkt #9) be **DENIED**;

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

**SO ORDERED** this 12th day of February, 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

15
Case 2:07-cr-00165-LA   Filed 02/12/08   Page 15 of 15   Document 27