# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  **v.**                                                **Case No. 07-CR-165**

**WALTER HAMBERGER**
    **Defendant.**

## DECISION AND ORDER

The government charged defendant Walter Hamberger with using a computer to attempt to entice a minor to engage in sexual activity, contrary to 18 U.S.C. § 2422(b). Defendant, who is deaf, moved to suppress a statement he made to law enforcement after his arrest, arguing that because the police did not communicate the Miranda warnings via American Sign Language his subsequent waiver of those rights was not knowing and intelligent. The magistrate judge handling pre-trial matters in this case held a hearing, then recommended that the motion be denied. Defendant objects, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b).[1]

## I. FACTS

### A. The Instant Interrogation

City of Milwaukee Police Detective Doreen Andrews, a member of the Internet Crimes Against Children Task Force, testified that in May and June 2007 (while acting in an undercover capacity posing as a fourteen year old girl named "Maria") she engaged in on-line chats with

---

[1] Neither side requests a de novo hearing, and I find the record made before the magistrate judge sufficient for me to rule. See United States v. Raddatz, 447 U.S. 667 (1980) (holding that the district judge may conduct de novo review without holding a de novo hearing).

a man known to her as "Wally" (later identified as defendant). (Evid. Hr'g Tr. [hereafter "Tr."] at 6-7; 12; 32; Govt.'s Ex. 5). The two arranged to meet in Kenosha, Wisconsin on June 13, 2007, and officers arrested defendant as he disembarked from a train from Illinois. Detective Andrews knew based on their previous communications that defendant was hearing impaired and wore a hearing aide, but she was not certain of the extent of his hearing loss. (Tr. at 7-8; 21; 43.)

After his arrest, officers transported defendant to the Kenosha Police Department. According to Andrews, defendant appeared calm and responded appropriately when directed to remove his personal items. (Tr. at 9; 79.) Andrews inquired about the availability of a sign language interpreter to conduct an interview with defendant but was advised that an interpreter would not be available until the next day. (Tr. at 10.) Andrews decided that because she had communicated with defendant in her undercover capacity via computer she would conduct an interview in that fashion. (Tr. at 11.) She testified that during their on-line chats she observed defendant to have no difficulty typing or responding appropriately. (Tr. at 11-12.)

Officers placed defendant in an interview room containing a computer and a keyboard. The interview was video-taped, and a copy of the tape was admitted in evidence at the hearing. (Tr. at 13; Govt.'s Ex. 1.) Andrews and her partner, Detective Sean Lips, were the only officers present, and neither was armed. (Tr. at 14-15.) Andrews testified that defendant appeared attentive and relatively calm; the officers placed him in no restraints, gave him a snack and permitted him to use the bathroom. (Tr. at 15; 25-26; Govt.'s Ex. 1.)

The officers provided defendant with a card containing the Miranda warnings, and Andrews typed the warnings on the computer while defendant followed along looking alternately at the card and the monitor. (Tr. at 17-18; Govt.'s Ex. 2.) Defendant flipped the

2

card – which was two-sided – over at the appropriate time, demonstrating that he was following along. (Tr. at 19.) After Andrews finished listing the Miranda rights, she typed, "Do you understand each of these rights?" (Govt.'s Ex. 4 at 1.) Defendant typed, "Yes I understand" in response. (Id.) Andrews then typed, "Realizing that you have these rights, are you now willing to answer questions or make a statement?" (Id.) Defendant typed, "I'll willing [sic] to answer questions." (Id.; Tr. at 21-22.) Andrews then proceeded to ask defendant questions on the computer. (Govt.'s Ex. 4 at 2-6.) Defendant signed the print-out of their dialog under the notation: "I have made the above statement without any threats or promises. It is my desire to state the true facts as to this incident. I have read the above statement and find it is true and correct." (Id. at 1.)

Andrews testified that defendant appeared to understand her and responded appropriately (Tr. at 22-23), and he asked no questions about his rights (Tr. at 86). At one point, when Andrews asked for consent to search defendant's house and computer, defendant responded, "Ok what if I refused to what do?" (Govt.'s Ex. 4 at 2.) Andrews replied, "That's up to you, I am asking for your consent and cooperation." (Id.) Defendant typed, "Yes I want to cooperation [sic]." (Id.) Andrews clarified, "You understand that you can refuse, but you are giving consent." (Id.) Defendant replied, "I am giving consent." (Id.; Tr. at 24.) Defendant then signed a separate consent to search form. (Tr. at 27; Govt.'s Ex. 3.) At another point in the interview, defendant pointed out a spelling error in a word he had typed. (Tr. at 29.) He also reviewed a print-out of his chats with "Maria," initialing each page. (Tr. at 33; Govt.'s Ex. 5.) Andrews told defendant that he could mark portions of the print-out, which he did. (Tr. at 34-35.) Towards the end of the interview, defendant indicated that his hearing aide batteries were low, and the officers retrieved extra batteries. (Tr. at 33; 38.) At no point during the

3

interrogation did defendant ask for a sign language interpreter.[2] (Tr. at 38.) Nor did he ever indicate that he did not understand what was taking place. (Tr. at 39.) Andrews testified that she had no concerns about defendant's comprehension of her questions or the Miranda warnings. (Tr. at 39.)

Detective Lips also testified that defendant appeared to have no difficulty understanding his rights. (Tr. at 148.) Lips indicated that defendant appeared to follow along very closely as Andrews typed, that he appeared calm and cooperative, and that he responded appropriately to the questions. (Tr. at 149-50.)

**B.    Previous Police Contacts**

The government presented testimony from three police officers who previously interacted with defendant. Detective Joseph Martin of the Fox Lake, Illinois Police Department testified that he arrested defendant for drunk driving on October 16, 2002. (Tr. at 95-97.) Martin also testified to about ten previous contacts with defendant, and that he knew, prior to the October 2002 arrest, of defendant's hearing impairment. Martin stated that defendant always carried a pad of paper and pen with him, and that they communicated by writing back and forth on the paper. (Tr. at 97-98.) Martin testified that after he arrested defendant on October 16, 2002, he advised defendant of his Miranda rights using defendant's pad of paper, writing out each of the warnings, then asking defendant if he understood. Defendant

---

[2]Andrews admitted that she did not ask defendant if he needed or wanted an interpreter. Nor did she ask him how long he had been deaf or about the extent of his deafness. (Tr. at 44-45.) At the beginning of the interview, she began speaking to defendant, asking, "You can hear me?" (Tr. at 47.) Defendant indicated that he could not. (Tr. at 48.) Andrews testified that defendant spoke at several points; sometimes she could understand him, other times not. (Tr. at 76; 91-92.) The day after the interrogation, an officer asked defendant in writing whether he needed a sign language interpreter for court, and defendant wrote in response that he did. (Def.'s Ex. 1; Tr. at 85.)

4

responded by writing "yes." (Tr. at 99-100; see also Govt.'s Ex. 9.) Martin testified that defendant did not appear confused and asked no questions about his rights (Tr. at 101-02), and Martin saw no need for a sign language interpreter (Tr. at 119). Martin indicated that he completed additional forms with defendant, communicating via pad and paper, and that defendant's responses were generally appropriate to the questions. (Tr. at 103-08; Govt.'s Ex. 8.) Martin testified that he had Mirandized defendant using the same procedure the previous month (September 2002) after arresting defendant for disorderly conduct, and defendant appeared to understand on that occasion as well. (Tr. at 109-10.)

Detective Michael Malczewski, also of the Fox Lake Police Department, testified that he arrested defendant for drunk driving on October 13, 2002, and had about five previous contacts with defendant in a law enforcement capacity. Malczewski stated that on these occasions officers communicated with defendant via the pen and pad defendant carried. (Tr. at 124-26.) Malczewski testified that after he arrested defendant on October 13, he advised defendant of his Miranda rights using a Fox Lake form and defendant's pad and pen. Malczewski believed that defendant understood the warnings, and defendant signed the Fox Lake acknowledgment and waiver of rights form. (Tr. at 127-29; Govt.'s Ex. 6.) Malczewski testified that he too completed additional forms with defendant, using the pad and pen, after defendant waived his Miranda rights. (Tr. at 130; Govt.'s Ex. 7.) Malczewski indicated that at no point during any of his dealings with defendant did defendant request a sign language interpreter. (Tr. at 136.)[3]

Finally, Fox Lake Police Officer William Golden testified to several types of contact with defendant, as a complainant, offender and wanted subject. (Tr. at 172-73.) Golden indicated

---

[3] Malczewski also testified that prior to his drunk driving arrest defendant had a driver's license, which would have required him to pass a written test. (Tr. at 137.)

5

that defendant communicated with officers in written form, and that defendant appeared to understand using this method of communication. (Tr. at 174-75.) Golden related a specific incident in which defendant filled out a written statement complaining of a domestic battery incident in June 2001. (Tr. at 175-76; Govt.'s Ex. 10.)[4]

## C.     Defendant's Expert Testimony

The defense presented testimony from Dr. McCay Vernon, an expert on the psychology of deafness. Dr. Vernon has written articles dealing with the Miranda warnings and deaf individuals, and produced a video for the Police Research Forum on the subject. (Tr. at 184-89; Def.'s Ex. 2.)

Dr. Vernon testified that American Sign Language ("ASL"), which he characterized as the primary language of those born deaf, is a language that has no written form. He indicated that it is a separate and distinct language from English in that it has a totally different syntax, grammar and vocabulary. (Tr. at 190-91.) Dr. Vernon indicated that defendant used ASL. (Tr. at 217.)

Dr. Vernon reviewed materials pertinent to this case, including the charging papers, interrogation video and transcript of the internet chats between defendant and "Maria." He also conducted a collateral interview with defendant's mother, pursuant to which he learned that

---

[4]The government also submitted certified copies of defendant's high school and college transcripts (Govt.'s Ex. 11 and 12), as well as certified copies of defendant's previous convictions in Illinois state court (Govt.'s Ex. 13-17). The school records indicate that defendant graduated high school (although he took special education courses) (Tr. at 194), and that his community college course work was primarily in subjects like auto body repair (Tr. at 253-54).

6

defendant was born deaf.[5] (Tr. at 193-94.) Dr. Vernon testified that those who are pre-lingually deaf have a "terrible time" ever understanding English. He indicated that the average educational attainment for the pre-lingually deaf is around fourth grade, irrespective of IQ. (Tr. at 194-95.) He explained that children learn language primarily by hearing it, and that deaf children are, based on their disability, deprived of mountains of information. (Tr. at 195.) He further testified that those unfamiliar with spoken English cannot lip read effectively, and that even the best lip readers, those post-lingually deaf, can understand only about 30% of what is said under the best conditions. (Tr. at 197-98.)

Dr. Vernon performed three tests on defendant, which indicated that defendant's reading vocabulary and comprehension level was about third grade. (Tr. at 200-02; Def.'s Ex. 4.) Dr. Vernon testified that studies have shown that the Miranda warnings require a sixth to eighth grade reading level to understand. (Tr. at 203; 237.) He explained that the Miranda warnings are conceptual in nature, dealing with abstract ideas and concerns rather than tangible things you can see or feel, and that translating the warnings into ASL requires extensive expansion. (Tr. at 204-05.) He further explained that hearing individuals, even if they have low reading levels, will likely have a better command of language than a deaf person, because they can get

---

[5]The record contains some dispute as to defendant's precise level of hearing. Dr. Vernon testified based on his interviews and an audiological report that defendant was totally deaf in one ear and had very limited hearing in the other. He indicated that defendant could hear environmental (e.g., thunder) and some speech sounds but could not understand spoken words. (Tr. at 196; 213; 234; Def.'s Ex. 3.) Dr. Vernon thus opined that defendant met the "real definition of deafness." (Tr. at 196.) However, the government presented an audiological report (Govt.'s Ex. 18) indicating that defendant's hearing may be greater with the use of a hearing aide (defendant did not wear the hearing aide during the test submitted by the defense) and noted that at certain points during the recorded interview it appeared that defendant responded to verbal questions (E.g., Govt.'s Ex 1 at 15:33:52; Tr. at 257; 234-35). I need not resolve this dispute in order to decide the motion.

7

data or information from hearing even if they do not read well. (Tr. at 202.)

Dr. Vernon testified that asking a deaf person, "do you understand?" was bad practice because deaf people are always asked that question and often smile and nod even though they don't really know what is going on. (Tr. at 206-07.) He indicated that it may at times appear to a hearing person that a deaf person understands – due to nodding or some other response denoting agreement – when that is not the case. (Tr. at 214.)

Dr. Vernon reviewed the video of defendant's interrogation and opined that typing the <u>Miranda</u> warnings for defendant was ineffective because defendant does not possess the reading level required to understand them. (Tr. at 208-09.) He also criticized the method of giving all of the warnings at once then asking defendant if he understood, rather than going through the rights one at a time. Dr. Vernon testified that the better practice would be to use an interpreter and give the warnings one sentence at a time, then ask defendant to repeat the right in his own words to ensure that he understood. (Tr. at 209.) Dr. Vernon concluded that based on his testing of defendant and review of the video, the <u>Miranda</u> warnings were not effectively communicated in this instance. (Tr. at 210.) He based his opinion on defendant's reading level and the level required to understand the warnings. He further opined that an interpreter could have bridged the gap, but he had some question as to whether it could ever be bridged effectively as to defendant. (Tr. at 210.) The fact that defendant had read the warnings after his previous arrests did not change Dr. Vernon's opinion. (Tr. at 211.) He indicated that the written statement defendant gave Officer Golden also did not change his opinion, as that statement demonstrated that defendant communicated at a low level, had nothing to do with <u>Miranda</u>, and concerned a concrete situation with no use of abstract language. (Tr. at 211-12.)

8

However, on cross examination Dr. Vernon admitted that some of the words contained in the report defendant prepared for Golden – such as "jealous" and "domestic battery" – were abstract and beyond a third grade level. (Tr. at 258-59.) Dr. Vernon also admitted that during his on-line chats with "Maria" defendant used some words above a third grade level. (Tr. at 261-62.) He further indicated that defendant's mother was not fluent in ASL, that she communicated with defendant via "home signs" and writing, and that when the material was more complex in nature they would write. (Tr. at 217-18.) Finally, he admitted that based on defendant's demeanor during the interrogation, it was reasonable for the officers to assume that defendant understood what was going on. (Tr. at 221.) Defendant's responses to Andrews's questions were generally appropriate. (Tr. at 222-23.)

Dr. Vernon further testified on cross that the method used by the Fox Lake officers of writing the warnings singularly, then asking defendant if he understood, was a much better approach, but without an interpreter he believed defendant would not really understand and would say "yes" even though he did not understand. (Tr. at 227-28.) Dr. Vernon concluded that in his opinion defendant could not understand written Miranda warnings, no matter how many times he had been provided them. (Tr. at 245.) However, he admitted that he had "no way to really know" in defendant's case, given that defendant may have been exposed to the warnings previously in his forty-one years of life. (Tr. at 267.)

## II.  DISCUSSION

### A.  Applicable Legal Standards

In order to safeguard the Fifth Amendment right against self-incrimination, a suspect must be advised of his rights to silence and counsel prior to being subjected to custodial

9

interrogation by law enforcement. See, e.g., United States v. James, 113 F.3d 721, 726 (7th Cir. 1997) (citing Miranda v. Arizona, 384 U.S. 436, 467 (1966)). Statements taken in the absence of such warnings may be suppressed from use at trial. See, e.g., United States v. Scheets, 188 F.3d 829, 840 (7th Cir. 1999).

However, the Supreme Court has never required that the warnings be given in any particular form or manner. See, e.g., Missouri v. Seibert, 542 U.S. 600, 611 (2004). Duckworth v. Eagan, 492 U.S. 195, 202 (1989); California v. Prysock, 453 U.S. 355, 359 (1981). "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'" Duckworth, 492 U.S. at 203 (quoting Prysock, 453 U.S. at 361). Further, once advised, a suspect may waive his rights, provided that his waiver is knowing and voluntary. See, e.g., United States v. Jackson, 300 F.3d 740, 748 (7th Cir. 2002). A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." A waiver is knowing and intelligent if

> made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986). In determining the validity of a waiver, courts consider factors such as the suspect's personal characteristics, the duration and conditions of the interrogation, and the conduct of the police. See, e.g., Jackson, 300 F.3d at 748. The government bears the burden of demonstrating a valid waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

10

**B. Analysis**

In the present case, defendant does not contest the voluntariness of his waiver or statement. Rather, the sole issue is whether his waiver was knowing and intelligent. I agree with the magistrate judge that it was.

Defendant concedes that Andrews provided him with written Miranda warnings, and that he indicated he understood and wanted to waive those rights. However, relying on the testimony of Dr. Vernon, defendant argues that the failure of the police to provide the warnings through an ASL interpreter invalidates his waiver. He contends that his grasp of written English is so limited that he could not understand the rights in the manner in which they were relayed. He points to Dr. Vernon's testimony that he reads at a third grade level, while the written Miranda warnings are at a sixth to eighth grade level. For reasons both legal and factual, the argument fails.

First, there is no authority for the proposition that, as a matter of law, a suspect must possess a certain reading comprehension level in order to knowingly waive the Miranda rights, as Dr. Vernon's testimony would seem to require. Rather, the cases hold that a defendant's cognitive abilities are but one factor to consider as part of the totality of the circumstances. See, e.g., United States v. Jackson, No. 05-CR-121, 2006 WL 1474212, at *6 (N.D. Ind. May 25, 2006) (finding waiver valid despite expert testimony that the defendant read at a first grade level and Miranda warnings require a much higher level); United States v. Gaines, 987 F. Supp. 1432, 1437 (S.D. Fla. 1997) ("The fact that the Defendant claims to have a low IQ does not automatically mean that he is incapable of understanding his rights, and this claimed lack of capacity to understand is belied by his actions at the time of his confession."). As the Seventh Circuit has explained, abstract thinking skills are not a prerequisite to an intelligent Miranda

11

waiver:

> Young's lawyers [contend] that comprehension of Miranda and the consequences of waiver requires abstract intelligence. Yet Young cannot count backward. He does not know which direction is "east" and thus cannot tell where the sun appears. Asked to name the Presidents since 1950, he answered "Washington" and "Lincoln." He knows that winter means cold and snow but cannot explain what "seasons" are. He cannot describe a ship (which of course he does not encounter in daily life). His command of analogies and categories is poor; he can't explain in what respects a dog is similar to a lion. But he knows that a "PD" in Illinois is a public defender, and he knows what a trial is for even though he cannot describe how the jury works. In other words, he has concrete knowledge suited to his occupation as a career criminal, but poor verbal skills, a low fund of general knowledge, and an inability to reason (or talk) abstractly.
>
> Do these deficiencies mean that a person such as Young is unable to confess to a crime? If entitlement to talk to the police depends on capacity to reason abstractly about the legal system and understand the long-term consequences of one's acts (such as the effect that a confession will have at trial), then the answer must be yes. Yet Miranda is not about abstract understanding, nor does the Constitution protect suspects against confessions that are made for reasons other than official coercion. Recall the point of the warnings: to protect the suspect's privilege against compulsory self-incrimination. . . . Young had enough awareness (the state court found) to understand what a lawyer is and his entitlement to direct the police to stop asking questions. This is all the fifth amendment demands. See Moran v. Burbine, 475 U.S. 412, 421 (1986).
>
> That Young may have been unable to understand why a lawyer's assistance might be important, as one of the psychiatrists concluded, is not legally material. Suspects need not know how legal skills could be employed to best advantage. That's asking too much and is too far removed from the goal that Miranda warnings are designed to implement. It is sufficient if the suspect has enough mental capacity to make decisions in daily life. An infant, or a person so incompetent that a guardian had been appointed, would be a different matter; the legal system generally does not allow such persons to form contracts or otherwise bind themselves. Young, though, is among the great majority of adults who can live independent lives, and as part of those lives can make choices with effects both good and bad.
>
> Perhaps the legal system should adopt additional rules to deal with suspects of limited intellectual abilities. But they are not now in place, nor has the Supreme Court concluded that rules of this kind are to be found in the Constitution. We have held that even teenagers can confess, and without the supervision or assistance of a supportive adult such as a parent. No decision holds that retarded suspects are unable to confess because they can't comprehend

Miranda warnings[.]

Young v. Walls, 311 F.3d 846, 849-51 (7th Cir. 2002) (internal citations omitted).

Similarly, while it is doubtless better practice to use a sign language interpreter to convey the Miranda warnings to a deaf person, I am aware of no authority for the proposition that, as a matter of constitutional law, such is always required. Rather, courts consider the issue on a case-by-case basis. See, e.g., People v. Brannon, 486 N.W.2d 83, 87-88 (Mich. Ct. App. 1992) (finding valid waiver where warnings were provided to hearing impaired defendant in written form); State v. Perry, 13 S.W.3d 724, 739 (Tenn. Crim. App. 1999) (finding valid waiver by deaf defendant where no sign language interpreter was used, but the defendant understood the written word); see also Stanley v. Lazaroff, 82 Fed. Appx. 407, 420-22 (6th Cir. 2003) (finding valid waiver where officer communicated warnings to hearing-impaired defendant in "pidgin" sign language); People v. McBride, 743 N.W.2d 884 (Mich. 2008), rev'g 729 N.W.2d 551 (Mich. Ct. App. 2006) (finding that a hearing-impaired defendant validly waived her Miranda rights by signing a written form, even though the ASL interpreter did not explain the form to the defendant or confirm that she understood); but cf. State v. Hindsley, 237 Wis. 2d 358, 373-74 (Ct. App. 2000) (finding waiver invalid where ASL translator was not used and there was no evidence of the defendant's proficiency in English).

I accept Dr. Vernon's testimony that English and ASL are separate languages, but courts have found valid Miranda waivers even when the warnings were not communicated in the defendant's primary language. See, e.g., Companeria v. Reid, 891 F.2d 1014, 1020 (2nd Cir. 1989); United States v. Bernard S., 795 F.2d 749, 752 (9th Cir. 1986). There is no indication that the officers sought to take advantage of defendant by communicating the warnings in written form rather than ASL, and as Dr. Vernon admitted, it was reasonable for the officers to

13

believe that defendant understood. See Rice v. Cooper, 148 F.3d 747, 750 (7th Cir. 1998) (stating that if the police have no reason to think that the suspect does not understand, there is nothing that smacks of abusive behavior).

Finally, as the magistrate judge fully explained, the facts of this case demonstrate that defendant did understand his rights. During the video-taped interrogation, defendant appeared calm and comfortable, he advised the officers when he did not understand or wanted something, he asked questions when the officers requested consent to search, and he responded appropriately to the officers' queries about this investigation.[6] His manner conveyed that he wanted to communicate via computer,[7] and at no time did he request an interpreter or indicate that he did not know what was going on. Further, the government presented evidence that defendant had been arrested and read his rights before. Dr. Vernon testified that simply reading unintelligible words over and over would not further someone's understanding, but he also admitted that he could not know whether defendant's prior exposure led to a greater understanding of the Miranda rights than his bare reading level would suggest. The testimony from the Fox Lake officers supports a greater understanding here. The government also demonstrated that defendant had experience communicating with police in writing. His written statement to Officer Golden, while riddled with spelling and grammatical errors, revealed that he was able to communicate regarding both concrete and abstract concepts. Likewise, his on-

---

[6] Defendant's responses suggest that he understood the significance of "Maria's" young age. For instance, he initially told Andrews that he had "lots of friends who are adults online." (Govt.'s Ex. 4 at 1.) After admitting that Maria said she was fourteen, defendant immediately apologized and said, "I will never do that again I promise." (Id.)

[7] The record demonstrates that defendant understands computers, screen names, etc., and the interrogation video shows him to be comfortable using a computer.

14

line chats with Maria demonstrated a grasp of concepts beyond a third grade level. That defendant was able to graduate high school and complete some post-secondary education bolsters this conclusion.

Dr. Vernon testified that deaf people often smile and nod as if in understanding, when in fact they really do not know what is going on. This may be true as a general matter. However, under the specific facts of this case, I find that defendant did understand the Miranda warnings provided on June 13, 2007. Therefore, for all of these reasons and those stated by the magistrate judge, the motion to suppress will be denied.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 27) is **ADOPTED**, and defendant's motion to suppress (R. 9) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

15

Case 2:07-cr-00165-LA   Filed 03/31/08   Page 15 of 15   Document 32